IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CRIMINAL NO. 11-CR-30046-02-MJR |
| | ) |
| SAUL RUELAS-VALDOVINOS, | ) |
| | ) |
| Defendant. | ) |

**UNITED STATES OF AMERICA'S**
**SUBMISSION OF RELEVANT OFFENSE CONDUCT**

Comes now the United States of America, by and through its attorneys, Stephen R. Wigginton, United States Attorney for the Southern District of Illinois, and Randy G. Massey, Assistant United States Attorney, and hereby submits its calculations of relevant offense conduct for the above-referenced Defendant. It is stated:

(1) On February 2, 2012, the Defendant entered an "open" plea of guilty to Count 2 of the Superseding Indictment in this case, which charged him with Conspiracy to Distribute and Possess with the Intent to Distribute Cocaine. The Government did not agree to recommend any particular sentence or guideline range and may in fact recommend that the defendant be sentenced to any sentence of incarceration, supervised release, fine, and/or restitution, up to and including the maximum allowed by law. The Defendant also admitted the Forfeiture Allegation contained in the Superseding Indictment.

(2) The Government and the Defendant stipulated that the Defendant's role in the conspiracy was as the primary source of supply for the cocaine distributed by members of the conspiracy. The Defendant provided cocaine to Ivan Vazquez-Gonzalez during the course of the

conspiracy, who caused it to be transported to and distributed within the Southern District of Illinois, Missouri, and elsewhere.

(3) The United States submits, that based upon the information currently available, the Government believes that the Defendant's relevant conduct is, conservatively, in excess of **200 kilograms** of cocaine. That submission is based, *inter alia*, upon the following facts:

- (A) On May 26, 2010, law enforcement agents in surveillance observed a drug transaction in the Northern District of Illinois, in which Defendant was involved. Further investigation resulted in the seizure of approximately **eight kilograms** of cocaine and $45,000 United States currency. Since the organization of which the Defendant was a member sold cocaine for approximately $21,000 per kilogram, $45,000 represents approximately **2.14 kilograms.**

- (B) On October 13, 2011, Jose Murillo, while accompanied by his attorney, gave a proffer statement to law enforcement officers related to the current case. At that time, Jose Murillo Ivan Vazquez-Gonzalez told him that when Ivan Vazquez-Gonzalez started selling cocaine, he sold two to three kilograms every two weeks; after that, Ivan Vazquez-Gonzalez told him that he would distribute eight to ten kilograms every two weeks for approximately one year. Using conservative calculations of only eight kilograms every other week for a year, this results in a total of **208 kilograms** of cocaine.

- (C) As corroboration of the quantity described in Paragraph (3)(B) above, the United States provides the following additional information:

    - (1) On November 1, 2011, Ivan Vazquez-Gonzalez, while accompanied by his attorney, gave a proffer statement to law enforcement and confirmed that during the course of the conspiracy, the Defendant was his primary source for the cocaine he distributed. He further identified the following as couriers working for him: Armando Murillo transported at least thirty-one kilograms for him; "Papo" transported 4-5 kilograms for him; "Botas" transported $70,000 to $80,000 to him, representing the proceeds of previously "fronted" cocaine; "Chava" transported at least six kilograms for him.

    - (2) On March 29, 2011, Luis Hernandez-Barahono made a post arrest statement to law enforcement and admitted that he was recruited to work as a courier for Vazquez-Gonzalez. In May 2010, Vazquez-

2

Gonzalez introduced him to the Defendant, whom he identified as his source of supply. This relationship was corroborated by telephone calls recorded pursuant to T-III authority. Hernandez-Barahono provided the following additional information about quantities that he delivered and drug proceeds collected for Vazquez-Gonzalez:

    (a)    Hernandez-Barahono sent Raul Gonzalez-Gonzalez to deliver one kilogram to Jose Garcia in May 2010;

    (b)    Picked up $50,000 to $60,000 from Mendoza on three separate occasions;

    (c)    Also picked up $20,500 from Mendoza on May 4, 2011;

    (d)    Delivered at least two kilograms to Jose Garcia;

    (e)    Delivered 250 grams to Jose Murillo;

    (f)    Delivered four kilograms to Guillermo Barbosa during the summer of 2010.

(3)    On May 18, 2011, Luis Hernandez-Barahono, while accompanied by his attorney, made a proffer statement to law enforcement and provided, *inter alia,* the following additional information:

    (a)    He was recruited in April 2010 to start working as a courier for Vazquez-Gonzalez; Vazquez-Gonzalez advised him that he would start off driving eight to twelve kilograms of cocaine per trip and then collect money from customers.

    (b)    He began distributing kilogram quantities of cocaine to various customers of Vazquez-Gonzalez in the St. Louis metropolitan area, including two kilograms to Jaime Hernandez, at which time he also picked up $21,000 for previously fronted cocaine; one kilogram to Jose Garcia; three kilograms to an individual at the Fairmount Park Race Track.

    (c)    In May 2010, he delivered 1.00 kilogram to Carmelo Mendoza and picked up $20,500 for previously fronted cocaine.

3

(d) In May 2010, he and Vazquez-Gonzalez collected approximately $200,000 for previously fronted cocaine; $206, 970 was seized by Pontoon Beach P.D. while it was being transported back to Chicago.

(e) In May 2010, he transported approximately $50,000 to Vazquez-Gonzalez and picked up three kilograms, which he then distributed to dealers in the St. Louis metro area.

(f) Shortly thereafter, he transported $60,000 to $70,000 to Vazquez-Gonzalez.

(g) During May 2010, he and Raul Gonzalez-Gonzalez went to Chicago and picked up six kilograms of cocaine from Vazquez-Gonzalez: he distributed two kilograms to Jaime Hernandez; two kilograms to Jose Garcia; one kilogram to Carmelo Mendoza; and one kilogram to Guillermo Barbosa-Ku.

(h) In May 2010, Vazquez-Gonzalez introduced him to the Defendant and advised him that he would "deal" with Defendant while Vazquez-Gonzalez was in Mexico; Defendant and Vazquez-Gonzalez then gave him two kilograms of cocaine to transport to Jose Murillo and Jose Garcia; he later transported approximately $40,000 back to Defendant.

(i) On July 8, 2010, he was stopped by Collinsville Police while he was transporting $85,353 in cash and three kilograms of cocaine to Defendant.

(j) Defendant provided him with three kilograms of cocaine in August 2010.

(k) In August or September 2010, he obtained four kilograms of cocaine from the Defendant.

(l) During March 2011, he began collecting money for previously fronted cocaine that had been transported by "Botas" and "Alex"; $65, 601 was seized from him by the Effingham County Sheriff's Department as he was transporting it to Vazquez-Gonzalez.

(4) On March 28, 2011, Daniel Ortiz, with his attorney present, gave a proffer statement to law enforcement and provided, *inter alia,* the following information:

    (a) From June 2009 - February 2010 (9 months), he obtained a quarter kilogram of cocaine per week from Jesus Chanocua; on three separate occasions, Chanocua brought him one kilogram; Chanocua obtained all of the cocaine provided to Ortiz from Vazquez-Gonzalez.

    (b) After Chanocua's arrest, Jose Garcia provided him with a quarter kilogram of cocaine per week for two months; Garcia obtained all of the cocaine provided to Ortiz from Vazquez-Gonzalez.

(5) On March 30, 2011, Guillermo Barbosa-Ku made a post-arrest statement, in which he provided, *inter alia,* the following information:

    (a) He purchased two kilograms from Vazquez-Gonzalez on April 26, 2010;

    (b) Admitted that he obtained two ounces of cocaine from Vazquez-Gonzalez as a sample for "Joe" in May 2010; later obtained a full kilogram of cocaine for "Joe."

(6) On April 15, 2011, Oscar Ortiz, with his attorney present, gave a proffer statement, in which he provided, *inter alia,* the following information:

    (a) Between April 2009 and January 2010, Oscar Ortiz conducted approximately thirty drug and currency transactions with Armando Murillo, who was a courier/distributor for Ivan Vazquez-Gonzalez; he would order quarter kilogram quantities from Vazquez-Gonzalez and Armando Murillo would deliver them to him;

    (b) Every few weeks, Armando Murillo would drive to Chicago for Vazquez-Gonzalez; Murillo would transport approximately $150,000 to $200,000 to

        Vazquez-Gonzalez and return with ten to fifteen kilograms;

    (c) On at least two occasions, Armando Murillo delivered a quarter kilogram of cocaine to Oscar Ortiz on the "front" from Vazquez-Gonzalez.

 (7) On June 22, 2011, Jaime Hernandez, with his attorney present, gave a proffer statement to law enforcement, in which he provided, *inter alia,* the following information:

    (a) On one occasion, Hernandez paid Armando Murillo $21,000 for Vazquez-Gonzalez as payment for previously "fronted" cocaine;

    (b) On one occasion, Jesus Chanocua picked up $21,000 from Hernandez for cocaine previously fronted by Vazquez-Gonzalez.

 (8) On July 27, 2011, Florentino Cruz-Amado, with his attorney present, gave a proffer statement to law enforcement, in which he provided, *inter alia,* the following information:

    (a) Cruz-Amado and Javier Villasenor-Cardona transported one kilogram of cocaine from Chicago for Ivan Vazquez-Gonzalez to Jose Murillo in February 2010.

    (b) On March 26, 2010, Cruz-Amado and Villasenor-Cardona transported approximately ten kilograms of cocaine for Vazquez-Gonzalez. The cocaine was seized by law enforcement during a traffic stop.

Pursuant to §2D1.1(c)(1) of the Sentencing Guidelines, relevant conduct of 150 kilograms or more of cocaine results in a base offense level of 38.

 (4) The United States believes that the evidence will show that the Defendant occupied a leadership role in the Vazquez-Gonzalez organization, especially during that time when Vazquez-Gonzalez was out of the country. As a result, and pursuant to the provisions of § 3B1.1(b) of the Sentencing Guidelines, the Defendant's base offense level should be increased by three levels.

(5) The Government will seek an Order of Forfeiture, pursuant to the Defendant's admission of the Forfeiture Allegation in the Superseding Indictment, in the amount of $9,000,000.00.

WHEREFORE, the United States respectfully submits its calculations of relevant offense conduct for the above-referenced Defendant.

        Respectfully submitted,

        STEPHEN R. WIGGINTON
        United States Attorney


        s//Randy G. Massey
        RANDY G. MASSEY
        Assistant United States Attorney
        Nine Executive Drive
        Fairview Heights, IL 62208
        Phone: 618-628-3700
        Fax: 618-628-3772
        E-Mail: Randy.Massey@usdoj.gov

**Certificate of Service**

I hereby certify that on February 14, 2012, I caused to be electronically filed United States of America's Submission of Relevant Offense Conduct with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

    Frank J. Himel, Esq.

    Respectfully submitted,

    STEPHEN R. WIGGINTON
    United States Attorney

    *s // Randy G. Massey*
    RANDY G. MASSEY
    Assistant United States Attorney
    Nine Executive Drive
    Fairview Heights, IL 62208
    Phone: 618-628-3700
    Fax: 618-628-3772
    E-Mail: Randy.Massey@usdoj.gov